## PEOPLE v. CALLAHAN.

(Supreme Court, Appellate Division, First Department. June 28, 1912.)

1. WITNESSES (§ 387*)—CROSS-EXAMINATION—RESTRICTION.

In a prosecution for burglary in breaking and entering a cigar store and stealing certain cigars, cigarettes, etc., an officer testified to seeing defendant shortly after the burglary standing near a horse and surrey in which part of the stolen goods were afterwards found; that a few minutes afterwards another man, B., emerged from a hallway leading from a saloon, spoke to defendant, entered the surrey, and started to drive east, when they were arrested. The officer admitted that he stated to the owner of the store that he saw defendant "in the wagon, driving the wagon," and he would not deny that he informed the lieutenant at the station house that both defendant and B. came from the hallway, but claimed that whatever he stated to the lieutenant was true. The statement entered on the blotter by the lieutenant was that both defendant and B. were found emerging from the hallway with boxes of cigars, boxes of cigarettes, and other things which they could not satisfactorily account for; also having one horse and wagon, apparently stolen. The officer was asked on cross-examination why he told the lieutenant that he saw both defendant and B. coming out of the hallway, to which an objection was sustained, and he was then asked if it was not a fact that defendant was 25 or 30 feet from the horse and surrey when he was first seen by the officer, and on objection this was excluded. *Held,* that the exclusion of such evidence was an improper restriction of defendant's right to cross-examine.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1228–1232; Dec. Dig. § 387.*]

2. WITNESSES (§ 358*)—CROSS-EXAMINATION—CHARACTER WITNESS—ASSUMED FACTS.

Where accused was charged, in connection with B., with having burglarized a store, and several witnesses, including his fiancée, testified that defendant's reputation for industry and honesty was good, it was error for the district attorney on cross-examination of the latter to ask her if she knew that defendant had lately been associated with a "thief" named B., based entirely on the fact that B. had been arrested with defendant on the occasion in question and had been tried and acquitted.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 822; Dec. Dig. § 358.*]

3. WITNESSES (§ 358*)—CHARACTER WITNESS—CROSS-EXAMINATION.
      Where the district attorney has reliable information that accused has
   associated with thieves, the attorney, in cross-examining character wit-
   nesses for accused, may ask whether they knew of such association or
   whether, if they did know it, it would affect their opinion as to the char-
   acter of accused.
      [Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 822; Dec. Dig.
   § 358.*]

4. WITNESSES (§ 345*)—ACCUSED'S CROSS-EXAMINATION.
      Defendant having offered himself as a witness, it was competent to
   show by him former convictions to discredit his testimony.
      [Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 802; Dec. Dig.
   § 345.*]

5. CRIMINAL LAW (§ 369*)—FORMER CONVICTION—PUNISHMENT.
      Where accused was indicted for burglary as a second offense, it was
   essential for the people to show a former conviction; but such conviction
   was material only on the question of sentence as provided by Penal Law
   (Consol. Laws 1909, c. 40) § 1941, and afforded no evidence that defend-
   ant committed the burglary in question.
      [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 822–824;
   Dec. Dig. § 369.*]

Appeal from Court of General Sessions, New York County.

Patrick Callahan was convicted of burglary in the third degree
as a second offense, and he appeals from a judgment of conviction
and from an order denying a motion for a new trial for newly dis-
covered evidence. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-
LIN, CLARKE, and SCOTT, JJ.

W. Bourke Cochran, of New York City, for appellant.
Louis Fabricant, of New York City, for the People.

LAUGHLIN, J. The burglary is alleged to have been committed
in the early morning of February 14, 1911, at No. 1442 First avenue,
which is at the corner of East Seventy-Fifth street. One Josef
Bantz had a store in the basement of the premises, where he con-
ducted the business of dealing in grape juice, cigars, and cigarettes.
He testified that he closed the store and locked the doors about mid-
night. A patrolman testified that at 3:15 a. m., in passing on his
beat, he saw that the doors were shut, and at 4:10 a. m., he found
that they had been forced from the hinges on one side and were
open; that he entered and found two boxes of cigars emptied and
the cigars and glasses thrown all over the floor and trampled upon,
and the faucet to a barrel of grape juice turned on and the grape
juice was flooding the place; that he looked over the premises care-
fully, and it did not look to him as though a burglar had been there,
but appeared to be "a spite job"; and that the owner, when sum-
moned by him, expressed the same opinion. The owner testified, "I
am sure now my place has not been burglarized," and that he so
informed the officer at the time, and also that he thought some
competitor had played a trick on him, and that he suspected two
men who had been in his place, and that the locks did not break, but

the hinges were wrought iron and had been "burnt." The defendant was arrested by a patrolman between the hours of 5 and 5:30 a. m., on the southerly side of Seventieth street at the southwesterly corner of First avenue.

[1] The officer testified that, as he approached, the defendant was standing on the sidewalk next the curb, within a couple of feet of a horse's head with one hand on the shaft of a two-seated surrey to which the horse was attached; that the horse looked "pretty well worn out and tired, sweated up"; that he asked the defendant where he had been with the horse and surrey at that hour, and defendant replied that he had taken a gentleman and lady from Madison avenue to Hamil Station, Long Island, and was just returning; that they had wined and dined him and gave him $2 "for a tip"; that the horse belonged to a fruit dealer in Harlem Market; that defendant was alone at the time, but in a few minutes another man emerged from a hallway leading from a licensed liquor saloon, and said to defendant, "Promise everything is all right," and defendant and the other man, who afterwards gave his name as Harris, but whose true name was Block, entered the surrey and started to drive to the east; that he commanded them to halt and placed them under arrest, and the defendant pulled the horse up against a snow bank and the horse fell down; that he told a citizen, who was passing, to notify his partner who was waiting for him at Sixty-Ninth street, and he and the defendant and Block unhitched and assisted the horse to its feet, which took about 10 minutes; that he looked into the surrey and found "about three or four boxes of cigars and two packages of cigarettes," which were produced in court; that he took defendant and Block to the station house, they riding in the surrey and he walking; that they made no effort to escape, either while the horse was down or afterward; and that he charged them with being suspicious characters. This officer admitted that he stated to Bantz that he saw the defendant "in the wagon, driving the wagon," and he would not deny that he informed the lieutenant at the station house that he saw both the defendant and Block emerge from the hallway, but he said that whatever he stated to the lieutenant was true. The statement entered on the blotter by the lieutenant was that both the defendant and Block "were found emerging from the hallway of the southwest corner of Seventieth street and First avenue, with two boxes of cigars, one box of cigarettes, and various other things which they could not satisfactorily account for, also one horse and wagon which is apparently stolen." The officer was asked on cross-examination why he told the lieutenant at the desk that he saw both the defendant and Block come out of the hallway. This was objected to and excluded. He was then asked if it was not a fact that the defendant was 25 or 30 feet away from the horse and surrey when first seen by him, and this was likewise objected to and excluded. Exceptions to these rulings were duly taken by defendant.

We agree with the learned counsel for the defendant that these rulings unduly limited the right of the defendant to cross-examine the principal witness for the people. The statement made by the of-

ficer and entered upon the blotter was not consistent with his testimony that the defendant had his hand on the shaft of the surrey when he first saw him, and, if true, would have tended to destroy *the only evidence* offered by the people tending to connect the defendant with the burglary, which was that he was in charge of the horse and surrey, and that some property belonging to Bantz was found in the surrey. Cross-examination of the witness on this vital point should have been permitted to a reasonable extent, and might have secured an admission that the statement that he saw the defendant come out of the hallway was true, and that it was not true that defendant was standing by, and apparently in charge of, the horse.

The horse and surrey were owned by one Edelman, who had been to Elmhurst, Long Island, and returned from there with his wife and a friend at about 12:45 that morning, and stopped in front of the Café Bismarck Restaurant on Eighty-Sixth street near Third or Lexington avenue, and apparently left the horse untied and entered the restaurant. The next seen of the horse and surrey was when defendant was arrested. February 13th that year was celebrated as Lincoln's birthday. The defendant testified: That he was invited to play the cornet at a club on 156th street and Melrose avenue that evening, and that he played there from 9 o'clock at night until 3:30 in the morning, and did not leave until 4 or 5 o'clock a. m., when he and others went to the Hartford Lunch Room at 149th street and Third avenue and had supper, and then took the Third avenue elevated train down, and fell asleep, and passed the Seventy-Sixth street station, where he intended to alight, but was awakened by the guard and got off at Sixty-Seventh street and walked up Third avenue to Seventieth street, and was going through Seventieth street on his way home, and, seeing a fire in the street, he stopped near it to get warm, as it was a cold morning, and lighted a cigarette, and while standing there he was approached by the officer, who asked what he was doing, to which he replied, "Warming myself," whereupon the officer asked, "Who owns that horse and carriage, do you know?" To which he replied in the negative. That the horse was standing between two piles of snow, and the officer took hold of the bridle to back the horse, and it tripped and fell, and that he and others assisted in getting the horse up, and then the officer left and returned with another officer in 10 minutes, and they asked the defendant where he got the rig, and "the stuff that was in it." That he denied any connection with it, and he and Block were then taken to the station house. And that he did not know Block, and did not tell the officer that he had been to Hamil Station with the horse.

[2] Four witnesses testified that the defendant's reputation for industry and honesty was good. One of them was his fiancée. She was asked on cross-examination whether she knew that "he has lately been associated with a thief named Block." The incorporation of the word "thief" in this question was duly objected to, but the objection was overruled, and defendant excepted. This reference was to Block, who was arrested on the occasion in question,

and the arrest is the only evidence that he was a thief, and it was stated on the argument that he was subsequently tried before another justice of the Court of General Sessions of the Peace on the same charge as that made against defendant, and acquitted.

[3] If the representative of the people had reliable information that defendant associated with thieves, he would have been justified in asking the character witness on cross-examination whether she knew that, or whether it would affect her opinion; but the assumption in the question that Block was a thief was highly prejudicial, for the jurors would naturally infer that the prosecuting officer knew and was asserting the fact.

There is evidence tending to show that some canceled checks, receipts, letters, and other papers belonging to Bantz were in one of the cigar boxes found in the surrey, and from this it was claimed that the cigars and cigarettes had also been taken, although they were not satisfactorily identified as the property of Bantz.

At the commencement of the trial, the defendant conceded that on the 25th day of November, 1904, when he was 18 years of age, he pleaded guilty before Recorder Goff to an indictment for burglary in the third degree, and was sentenced to the Elmira Reformatory, where he was confined for 12 months and 20 days. The defendant further testified that he was an ironworker, and a member of the ironworkers' union in good standing; that during the past 19 years, with the exception of the time he was imprisoned at Elmira, he lived with his mother and two brothers at No. 425 East Seventy-Seventh street; that at the time of the alleged burglary he was regularly employed as an ironworker on the Municipal Building in the borough of Manhattan, New York; and that he received $27.50 for 44 hours work, but did not have steady work. On his cross-examination, it was shown that in the year 1897 he was in the Catholic Protectory, and remained there three or four years, and that after he came out he committed the burglary for which he was sent to Elmira, and he was then asked if he did not attempt to commit a burglary, or was not caught on the roof of premises on East Seventy-First street about seven months prior to the trial, to which he replied in the negative; but he admitted that he was *arrested* at Seventy-Ninth street and Third avenue in the month of January before the trial.

[4, 5] The defendant having offered himself as a witness, it was competent to show former convictions to discredit his testimony, and, under the indictment, it was essential for the people to show a former conviction; but, in the case at bar, we are of opinion that these are the things which led to the conviction of the defendant, rather than the evidence adduced against him. The former conviction afforded no evidence that the defendant committed the burglary in question. It was material only on the question of sentence. Penal Law, § 1941.

The testimony of the officer, to which reference has been made, is the only evidence tending to show any acquaintance between the defendant and Block. The theory of the prosecution is that they

were pals in crime, and stole this horse and surrey and were using them in going about the city committing burglaries, and that after stealing the horse and surrey, and knowing that the aid of the police was likely to be asked to find them, the defendant stood at that early hour of the morning in charge of the horse, while Block was attempting to burglarize the nearest store, and thus serenely awaited the approach of the patrolman; and that his pal assumed that they could escape arrest by the defendant's assuring the officer, on his suggestion made in the presence and hearing of the officer, that everything was "all right."

We think it highly improbable that the jury would have convicted the defendant, were it not for his previous bad record. It does not satisfactorily appear that the store was broken into for the purpose of theft. There is no evidence that any tools were found on either Block or the defendant, with which they could have pried the hinges off the doors, burned them, or broken into the store. Nor was it shown that they could have had any purpose or motive in maliciously destroying the property of Bantz. If they entered his store for the purpose of burglary, it is probable that they would have occupied their time selecting articles which would be of some use to them— especially if they had a horse and wagon—instead of committing the acts disclosed by the testimony of the officer and the owner. If, as the owner and one police officer inferred from appearances, the store was broken into maliciously, it is possible that the perpetrators of the act put the cigar boxes and cigarettes into the surrey, which they found unattended somewhere on one of the public streets.

We are therefore of opinion that the ends of justice require that the defendant should have a new trial. These views render it unnecessary to review the order denying the motion for a new trial, and the appeal therefrom should be dismissed.

It follows that the judgment should be reversed, and a new trial granted. All concur.